IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | | |
|---|---|---|
| DEBRA THOMAS, | ) | Civil No. 09-1250-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Tim Wilborn
Attorney at Law
P.O. Box 2768
Oregon City, OR 97045

        Attorney for Plaintiff

Dwight C. Holton, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902


FINDINGS AND RECOMMENDATION - 1

Lisa Goldoftas
Special Asst. U.S. Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Debra Thomas brings this action pursuant to 42 U.S.C. § 405(g)

seeking judicial review of a final decision of the Commissioner of Social Security

(the Commissioner) denying her application for disability insurance benefits (DIB) under

Title II of the Social Security Act, 42 U.S.C. §§ 401-33.  For the reasons set out below,

the decision of the Commissioner should be affirmed.


**<u>Procedural Background</u>**

Plaintiff filed applications for DIB and Supplemental Security Income (SSI) on

May 2, 1995, and was found to have been disabled as of April 26, 1994.  Her disability was

subsequently found to have ended in April, 2002, and she did not appeal the determination

that she was no longer disabled as of that date.

Plaintiff filed another application for DIB on October 2, 2003, alleging that she had

been disabled since August 1, 2002.  Following denial of that claim initially and upon

reconsideration, plaintiff timely requested a hearing before an Administrative Law Judge

(ALJ).


FINDINGS AND RECOMMENDATION - 2

On August 14, 2006, a hearing was held before ALJ Dan Hyatt. Plaintiff, a medical expert (ME), and a vocational expert (VE) testified at the hearing. A second hearing, at which plaintiff again testified, was held before ALJ Hyatt on May 8, 2007.

In a decision dated June 11, 2007, ALJ Hyatt found that plaintiff was not disabled within the meaning of the Social Security Act (the Act). That decision became the final decision of the Commissioner on August 29, 2009, when the Appeals Council denied plaintiff's request for review. In the present action, plaintiff challenges that decision.

## Factual Background

Plaintiff was born on August 5, 1958, and was 48 years old at the time of the ALJ's unfavorable decision. She has completed three years of college. She has worked in the past, including part-time work as a customer service representative in 2006 and 2007. However, because none of plaintiff's work during the 15-year period preceding the ALJ's decision qualified as substantial gainful employment, plaintiff has no past relevant work.

Plaintiff alleges that she is disabled by a combination of impairments including somatoform disorder, an affective disorder, a personality disorder, bilateral carpal tunnel syndrome, and reflex sympathetic dystrophy (RSD).

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

FINDINGS AND RECOMMENDATION - 3

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The

Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

## Medical Record

In notes of a visit on May 23, 2002, Dr. Huey Meeker indicated that plaintiff "still has a lot of suicidal ideation at times" though she was taking Celexa and Depakote.  In a chart note dated September 13, 2002, Dr. Huey Meeker indicated that he saw plaintiff for a "follow up of depression."  He noted that plaintiff was taking Celexa and Zyprexa, and had a depressed affect and mood.  In notes of a visit on November 11, 2002, Dr. Meeker indicated that plaintiff reported tingling and numbness in the fingers of her left hand and some pain in her right leg.  He diagnosed carpal tunnel syndrome of the left hand, and recommended a wrist brace.

On August 18, 2003, plaintiff was evaluated by MSW Casadi Marino at Clackamas County Mental Health.  Plaintiff reported that she had a history of childhood trauma and recent, uncontrollable crying.  She told Marino that she was not eating, bathing, or brushing her teeth, and that she had little interest in activities.  Plaintiff also stated that she had participated in mental health treatment intermittently during the previous 12 years, and

FINDINGS AND RECOMMENDATION - 5

Marino indicated that plaintiff had been diagnosed with Dysthymic disorder, Generalized Anxiety Disorder, and Cannabis Abuse. Marino observed that plaintiff exhibited some psychomotor agitation and dysphoric affect. Marino listed plaintiff's diagnoses as Dysthymic Disorder, Generalized Anxiety disorder, Cannabis Abuse, and Major Depressive Disorder. She rated plaintiff's Global Assessment of Functioning (GAF) at 55.

Chris Potter began counseling plaintiff on August 29, 2003. At that time, Potter noted that plaintiff "demonstrated good insight," and opined that her presentation was consistent with mild to moderate depression. In notes of a counseling session on September 9, 2003, Potter indicated that plaintiff was increasingly stressed, appeared tired, and had continued symptoms of depression, as well as Cluster C personality disorder traits. On October 23, 2003, Potter noted that plaintiff had severe itching, and had told him that she had become so anxious at work that she had vomited.

Dr. Lowan Stewart examined plaintiff on January 29, 2004. Dr. Stewart noted that plaintiff reported that she had chronic pain in her right lower extremity, resulting from a fall. He reported that plaintiff had seen a number of pain specialists, and had tried narcotics, physical therapy, nonsteroidals, massage, and acupuncture, without obtaining relief. On examination, plaintiff had decreased sensation to temperature in her right foot, in a non-dermatomal pattern. Dr. Stewart reported that plaintiff could walk on her toes with minimal difficulty, used no assistive device, had no crepitus, effusion, deformities, tenderness, or warmth in her right foot, and no tenderness over her metatarsals. Plaintiff's right ankle was also normal upon examination. Dr. Stewart found that plaintiff's motor strength was "5/5 in the upper and lower extremities in all muscle groups," and that plaintiff had "normal fine motor coordination." Plaintiff's grip strength was normal bilaterally, and she had no atrophy.

FINDINGS AND RECOMMENDATION - 6

Dr. Stewart opined that plaintiff might have Reflex Sympathetic Dystrophy (RSD). He also opined that plaintiff could be expected to stand and walk without restriction, but that, based upon her statements, she was limited to less than two hours of standing or walking. Dr. Stewart opined that plaintiff could lift 20 pounds frequently and 50 pounds occasionally "although this might be limited by her difficulty bearing weight on the right foot by history." He found that plaintiff had no postural, manipulative, visual, communicative, or workplace environmental limitations.

At the request of the Agency, Dr. David Gostnell, a clinical neuropsychologist, evaluated plaintiff on February 5, 2004. Plaintiff told Dr. Gostnell that she had been taking antidepressants for the previous 10 years, and continued to experience a "wide spectrum of symptoms of depression." Plaintiff said that she had insomnia for about four hours nightly, and that she had gained 50 pounds during the previous 18 months because of her antidepressant medication. Plaintiff was 5'2", and weighed 170 pounds. Plaintiff reported that she had continual depression, low motivation, no interest in socializing, daily suicidal thoughts, variable appetite, low energy, fatigue, shortness of breath, and pain. She said she had been losing track of days, was forgetting to take her medications, was becoming disorganized, was irritable, was frequently angry, and cried often. Plaintiff reported a history of abusive relationships, and said that she used marijuana to relieve muscle pain and lessen her nausea. Dr. Gostnell indicated that plaintiff's speech was loud, pressured, tangential, and impulsive, and that plaintiff needed to be redirected to interview questions. He also noted that she displayed some ruminative, obsessive thoughts. Dr. Gosnell reported that plaintiff was "fluent and intelligible," that her "grammar and vocabulary were consistent with her educational background," and that she "seemed to have no difficulty comprehending

FINDINGS AND RECOMMENDATION - 7

interview questions."  Plaintiff's affect "ranged widely," and her "predominant affective tone was euthymic, somewhat inconsistent with her depressed mood."

Plaintiff told Dr. Gosnell that she had fractured three bones in her foot 9 years earlier, and had subsequently been diagnosed with RSD.  She also reported two "spinal surgeries," which Dr. Gosnell concluded probably referred to steroid injections into plaintiff's lumbar spine.

Dr. Gosnell diagnosed Dysthymic Disorder, Pain disorder Associated with Psychological Factors and a General Medical Condition, rule-out Cannabis Dependence, and Dependent Personality Features.

Dr. Karen Bates-Smith, an Agency medical consultant, assessed plaintiff's functional capacity in an evaluation dated February 12, 2004.  Dr. Bates-Smith, a psychologist, opined that plaintiff's ability to carry out detailed instructions, ability to interact appropriately with the general public, and ability to set realistic goals or make plans independently were moderately limited, and that plaintiff was not otherwise significantly limited.  She concluded that plaintiff could understand and carry out simple tasks on a consistent basis, should not be expected to work with the general public, and could benefit from vocational rehabilitation. In a functional capacity assessment dated May 11, 2004, Dr. Dorothy Anderson, a consulting Agency psychologist who reviewed plaintiff's file, concluded that plaintiff could understand, remember, and carry out short, simple instructions, maintain attention and concentration, and "sustain a normal workday/work week."  Dr. Anderson opined that plaintiff would be more successful in a setting that did not require extensive contact with the general public, and would benefit from assistance with identifying and locating suitable employment.

FINDINGS AND RECOMMENDATION - 8

In a telephone call to Clackamas County Mental Health (CCMH) on February 24, 2004, plaintiff reported that she was "struggling with homelessness" and "not doing very well in general." On May 7, 2004, plaintiff returned to CCMH for treatment. She reported that she had been too depressed to get out of bed and had not been able to make it to appointments during the pervious several months. A counselor opined that plaintiff's presentation was "consistent with major depression [and] avoiding personality traits . . . ." Her GAF was rated at 45 to 50, a score that indicated "serious impairment," such as the inability to hold a job, according to the Diagnostic and Statistical Manual of Mental Disorders. See page 34, DSM-IV-TR.

On May 26, 2004, Dr. Terry Paddon, a psychologist with CCMH, assessed plaintiff concerning alcohol and drug issues. Plaintiff told Dr. Paddon that she thought about suicide "all the time because of chronic pain," and that she would "gladly have her leg amputated so she would not have to feel the pain anymore." Plaintiff told Dr. Paddon that she was not interested in discontinuing her use of marijuana, because she preferred using that drug for pain management instead of opiate/narcotic pain medications. He did not recommend drug treatment.

On June 22, 2004, plaintiff told a therapist that she had been fired from her job for not being "aggressive" enough. On July 13, 2004, plaintiff told her therapist that she had cleaned "a couple of houses" and had painted a fence in an effort to stay active. She also told him that she was interested in vocational rehabilitation, that she was doing better overall, and that she was experiencing a lower level of anxiety and depression. The therapist described plaintiff as being "slightly depressed due to lack of employment." On August 6, 2004, the therapist noted that plaintiff was jittery and lacked focus, and opined that these symptoms

were consistent with a generalized anxiety disorder and avoiding personality disorders. On August 6, 2004, PMHNP Casey Dugan stated that plaintiff reported some brief, transient suicidal ideation, but was "generally stable with some periods of dysphoria related to her circumstances."

In chart notes dated December 29, 2004, Dr. Meeker indicated that plaintiff had sought treatment for "chronic pain syndrome in the right leg from reflex sympathetic dystrophy." Plaintiff's mood and affect were flat. Dr. Meeker diagnosed RSD with chronic leg pain, and depression, and prescribed Ultram for pain relief.

On April 12, 2005, a therapist at CCMH noted that plaintiff had returned after being out of therapy for almost 6 months. Plaintiff reported that she was frustrated with vocational rehabilitation, and with being unable to develop a resume, which she described as her main obstacle to employment. Plaintiff was anxious and "talkative." Her GAF was assessed at 50-55.

Notes of a therapy session at CCMH on April 25, 2005, indicate that plaintiff was very frustrated and irritable since she had reduced her marijuana use to three times per week. Plaintiff presented in an "irritable, frustrated fashion," and was tearful at times. She acknowledged her "possible dependency on the marijuana," but was trying to obtain a medical marijuana card "to manage her pain and appetite problems."

On November 10, 2005, Dr. Meeker treated plaintiff for numbness, tingling, and inability to maintain grip in plaintiff's left hand. Dr. Meeker noted that she had had a clinical diagnosis of carpal tunnel syndrome in 2002, and he diagnosed carpal tunnel syndrome. In notes of a follow-up appointment on January 10, 2006, Dr. Meeker indicated that a nerve

FINDINGS AND RECOMMENDATION - 10

conduction study had confirmed mild to moderate bilateral carpal tunnel syndrome, with symptoms more severe in the left wrist, which he injected with cortisone.

In a "to whom it may concern" letter dated August 17, 2006, Dr. Meeker stated that plaintiff was his patient, and that she "has reflex sympathetic dystrophy which is a disabling condition."

### ALJ's Decision

At the first step of his evaluation, the ALJ found that plaintiff had not engaged in any substantial gainful activity (SGA) at any time that was relevant to his decision.

At the second step, the ALJ found that plaintiff's somatoform disorder, affective disorder, a personality disorder, marijuana abuse, carpal tunnel syndrome, and RDS were "severe" impairments.

At the third step of his evaluation, the ALJ found that these severe impairments, alone or in combination, did not meet or equal an impairment set out in the Listings, 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526).

The ALJ next assessed plaintiff's residual functional capacity. He concluded that plaintiff had the capacity to lift 20 pounds occasionally and 10 pounds frequently, could stand for 6 hours and walk for 2 hours, and could sit for 8 hours, during an 8-hour day. The ALJ found that plaintiff "requires the ability to make postural changes at will," and, in an obvious clerical error, found that she was "limited to frequent public contact."[1]  The ALJ also found

---

[1]When posing these limitations in his hypothetical to the VE, the ALJ stated that "[p]ublic contact is limited to frequent . . . ."  When the VE asked if he had said "limited to frequent," the ALJ responded "[o]ccasional."  "Occasional?" the VE asked. "Yeah," replied the ALJ.

that plaintiff was limited to occasional fine manipulation with her left hand.  In reaching these conclusions, the ALJ determined that plaintiff was not wholly credible in her description of her symptoms and limitations.

At the fourth step, the ALJ found that plaintiff had no past relevant work.

At the fifth step, the ALJ found that plaintiff could work as a housekeeper/cleaner, an assembler, or an appointment clerk, and that these jobs existed in significant numbers in the national economy.  Accordingly, he found that she was not disabled within the meaning of the Act.

## Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether

FINDINGS AND RECOMMENDATION - 12

it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771,

772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if

"the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at

1039-40.


**<u>Discussion</u>**

Plaintiff contends that the ALJ erred in failing to find that her mental impairments

met or equaled a listed impairment, failed to properly evaluate her residual functional

capacity, improperly rejected the opinion of plaintiff's treating doctor, improperly rejected

her testimony, and failed to meet his burden of establishing, at step five of his analysis, that

plaintiff could perform "other work."


1. **<u>ALJ's conclusion that plaintiff's mental impairments did not meet or equal Listing</u>**

**<u>12.07</u>**

Plaintiff contends that the ALJ erred in failing to find that her mental impairments,

combined with her RSD, met or equaled Listing 12.07, and in failing to provide the required

support for this conclusion.

Based upon my review of the ALJ's opinion and relevant portions of the medical

record, I disagree.  In order to meet or equal Listing 12.07, a somatoform disorder must result

in marked restrictions in two of three specified areas, or in marked restrictions in one area

combined with repeated episodes of decompensation of extended duration.  As support for

his conclusion that plaintiff did not have an impairment or combination of impairments that

met or medically equaled a listed impairment, the ALJ observed that plaintiff's reflex

FINDINGS AND RECOMMENDATION - 13

sympathetic dystrophy did not meet the criteria of a listed impairment, and noted that

Dr. Crossen, the ME who attended the hearing, testified to levels of restriction caused by

plaintiff's mental impairments which did not satisfy the Listing requirements.  The ALJ

concluded that Dr. Crossen's testimony in this regard was both credible and consistent with

the treatment record.  He further observed that plaintiff functioned independently and had

worked on a part-time basis and exhibited no cognitive deficits, that there was no evidence of

episodes of decompensation, and that an evaluating psychologist had indicated that plaintiff's

use of marijuana might reduce her motivation.

        Plaintiff contends that the ALJ failed to properly address the question whether her

impairments equaled Listing 12.07 because his analysis was simply "boilerplate."  I disagree.

In Gonalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990), the court concluded that it was

"unnecessary to require the Secretary, as a matter of law, to state why a claimant failed to

satisfy every different section of the listing of impairment."  The court observed that the

ALJ's "four page 'evaluation of the evidence' is an adequate statement of the 'foundations

on which the ultimate factual conclusions are based.' "  Id.  Here, the ALJ's conclusion that

plaintiff's impairments did not meet or equal a listed impairment was adequately accounted

for in his discussion of the evidence, and was supported by substantial evidence in the

medical record.


## 2. **ALJ's RFC and Vocational Hypothetical**

        Plaintiff asserts that the ALJ's assessment of her residual functional capacity failed

to "accurately capture" her "multiple severe mental impairments."  She contends that the

only restriction that the ALJ imposed which was related to her mental impairments was a

FINDINGS AND RECOMMENDATION - 14

limitation to "frequent public contact" which is no limitation at all. Plaintiff further asserts

that the VE's testimony lacked evidentiary value because the ALJ's vocational hypothetical

questions failed to include all of her limitations.

As noted above, the ALJ's assertion that plaintiff was "limited to frequent public

contact" was clearly a clerical error: the ALJ made the same error at the hearing, and

unequivocally corrected the error in response to a query from the VE. There is no doubt that

the ALJ imposed a limitation of only occasional public contact in his hypothetical to the VE,

and that limitation is clearly reflected in his decision. The ALJ rejected the conclusion of

state agency consultants that plaintiff was limited to "simple work," because he found

"no evidence" supporting that restriction. That conclusion was supported by substantial

evidence in the record. The ALJ correctly noted that plaintiff had worked part-time as an

appointment clerk in 2006, and that plaintiff's psychological evaluation showed no evidence

of cognitive impairment.

As the Commissioner correctly notes, the ALJ is responsible for determining a

claimant's residual functional capacity. 20 C.F.R. § 404.1546; SSR 96-5p. In doing so, the

ALJ is required to consider the record as a whole, and to explain the weighing of the medical

evidence and testimony concerning the claimant's residual functional capacity. SSR 96-5p.

In analyzing a claimant's residual functional capacity, an ALJ may consider whether a

claimant's subjective complaints lack credibility, Bayliss v. Barnhart, 427 F.3d 1211, 1217

(9th Cir. 2005), and need not include opinion evidence that is properly discounted. Batson v.

Commissioner of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004). The ALJ here

considered the record as a whole, and explained his analysis of the medical evidence and

testimony. His conclusion that plaintiff's mental impairments imposed only a limitation to

FINDINGS AND RECOMMENDATION - 15

occasional public contact was supported by both his determination that plaintiff's testimony was not entirely credible, and his rejection of certain medical opinion. As discussed below, I have concluded that the ALJ provided sufficient support for his credibility determination and for his evaluation of medical opinion that could have supported the determination that plaintiff's mental impairments resulted in greater limitations.

The ALJ here provided sufficient support for his evaluation of plaintiff's mental residual functional capacity, and for his decision to impose only a limitation to occasional public contact based upon plaintiff's mental impairments. He clearly considered the record as a whole, and explained his evaluation of the testimony and medical evidence. The ALJ's conclusion that plaintiff's subjective description of the severity of her impairments was not wholly credible met the applicable standards, and supported the conclusion that no additional limitations should be imposed based upon her mental RFC.

Plaintiff correctly notes that an ALJ's vocational hypothetical must set out all of a claimant's impairments, and that a VE's testimony that a claimant can perform certain work has no evidentiary value if the hypothetical does not meet this requirement. E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The ALJ's hypothetical here included all of the limitations that the ALJ found were credible and supported by substantial evidence in the record, and the ALJ provided sufficient support for his assessment of plaintiff's mental residual functional capacity. Under these circumstances, the VE's testimony had evidentiary value.

FINDINGS AND RECOMMENDATION - 16

3. <u>**ALJ's Assessment of Plaintiff's Credibility**</u>

As noted above, the ALJ found that plaintiff's description of the severity of her symptoms and impairments was not wholly credible.  Plaintiff contends that the ALJ did not provide legally sufficient reasons for supporting this conclusion.

a. <u>**Standards**</u>

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities.  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).  If a claimant produces medical evidence of an underlying impairment, the ALJ  may not discredit the claimant's testimony concerning the severity of symptoms merely because the testimony is unsupported by objective medical evidence.  <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998) <u>citing</u> <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 343 (9th Cir. 1990) (*en banc)*.  Unless there is affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. <u>Id.</u>, <u>quoting</u> <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995).

An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the testimony that is not credible and the evidence that undermines the claimant's complaints.  <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993).  In addition, SSR 96-7 requires an ALJ to consider the entire record and to consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."  An ALJ may support a determination that the claimant was not

entirely credible by identifying inconsistencies or contradictions between the claimant's complaints and her activities of daily living.  Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).


b. **Analysis**

Plaintiff correctly asserts that the ALJ was required to provide clear and convincing reasons for finding that she was not wholly credible: There is no question that her impairments could cause some degree of the symptoms alleged, and there is no evidence of malingering.  She contends that the ALJ erred in asserting that she had an "active lifestyle," and supporting his credibility determination with her ability to work part time, the absence of evidence that she needed to lie down two times every day, her use of a cane which was not prescribed, and her use of marijuana to stimulate appetite when there is no evidence of weight loss.  Plaintiff also contends that, in asserting that her allegations of pain were inconsistent with the treatment records, the ALJ improperly ignored the psychological basis of her pain.  She contends that the court should credit her testimony as a matter of law, find her disabled, and remand this action for an award of benefits.

The ALJ here provided legally sufficient support for his conclusion that plaintiff's testimony concerning the severity of her impairments and symptoms was not wholly credible. The ALJ cited a number of inconsistencies in her statements.  He correctly noted that Dr. Crossen, the ME,  testified that plaintiff "provided inconsistent information in her reports of marijuana use."  The ALJ also cited Dr. Crossen's observation that plaintiff "tended to report her limitations in extreme ways and that her self-report of symptoms and limitations must be viewed in this light."  The ALJ correctly noted that there was no medical evidence

that plaintiff needed to lie down twice a day, as she testified, and cited a number of
inconsistencies in her testimony.  He correctly noted that, though plaintiff asserted that she
needed to smoke marijuana because of a loss of appetite, there was no evidence of weight
loss in the record, which instead indicated that plaintiff gained weight.  Evidence in the
record supported the ALJ's observation that plaintiff maintained an active lifestyle, despite
her complaints of debilitating pain and depression.  The ALJ correctly noted that plaintiff had
reported cleaning houses and painting a fence in May, 2004, reported that she was spending
her days with her mother, working in the yard, in August 2004, and was able to work 25
hours per week for an extended period of time, and stopped that activity only when the
business closed.

Under appropriate circumstances, conservative treatment may support the conclusion
that a claimant's testimony concerning the severity of an impairment is not credible.  See
Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007).  Here, the ALJ correctly observed that
plaintiff had received only conservative treatment for alleged pain in her left hand and right
leg.  He also correctly noted that Dr. Stewart, an examining physician, had found that
plaintiff's limitations were markedly inconsistent with her description of her impairments.
The ALJ cited Dr. Stewart's conclusion that plaintiff's ability to stand and walk was
"unrestricted," though "by her description would be limited to less than two hours," and
Dr. Stewart's opinion that plaintiff in fact had "no postural, manipulative or environmental
limitations."

The ALJ here satisfied his burden of providing clear and convincing reasons,
supported by the record, for concluding that plaintiff was not entirely credible.

FINDINGS AND RECOMMENDATION - 19

4. **ALJ's Evaluation of Opinion of Plaintiff's Treating Physician**

As noted above, Dr. Meeker, plaintiff's treating physician, stated that plaintiff "has reflex sympathetic dystrophy which is a disabling condition."  Noting that Dr. Meeker provided "no specific functional limitations" and that "[h]is opinion involves vocational issues of which he has no expertise," the ALJ rejected this opinion.  Plaintiff contends that the ALJ failed to provide legally sufficient reasons for rejecting Dr. Meeker's opinion.

Dr. Meeker's opinion as to plaintiff's disability was contradicted by other medical opinions in the record. Accordingly, the ALJ was required to provide "specific and legitimate reasons," supported by substantial evidence in the record for its rejection.  See, e.g., Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1996).

Though the ALJ's evaluation of Dr. Meeker's opinion was remarkably brief, in the larger context of the ALJ's discussion of the medical evidence and opinions, it was sufficient. A treating physician's opinion is not conclusive as to the ultimate question of disability. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  Instead, the ultimate opinion as to a claimant's disability is an issue reserved to the Commissioner, SSR 96-5p, and the ALJ is "the final arbiter with respect to resolving ambiguities in the medical record." Tomasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008).  In addition, an ALJ need not accept medical opinions that are conclusory and unsubstantiated by medical documentation. Johnson v. Shalala, 60 F.3d 1428, 1433 (9th Cir. 1995).

Here, the ALJ addressed Dr. Meeker's opinion after fully setting out the opinions of Dr. Stewart, an examining physician, concerning plaintiff's functional capacity.  After noting Dr. Stewart's conclusions concerning plaintiff's functional capacity in a number of areas, the ALJ accurately noted that Dr. Meeker had provided "no specific functional limitations."

Dr. Meeker's opinion was conclusory in the extreme.  Dr. Meeker cited no supporting

medical evidence or documentation and did not support his conclusion as to plaintiff's

disability with any functional assessment.  Instead, he merely stated a conclusion as to the

ultimate question of disability, a matter which is reserved for the Commissioner.  In this

context, the ALJ's reasons for rejecting Dr. Meeker's opinion were sufficient.


5. **ALJ's Step Five Determination**

      The ALJ determined that, because she had not performed any substantial gainful

activity during the previous 15 years, plaintiff had no past relevant work.  He also found that,

because she had no past relevant work, plaintiff had no transferable skills.  Based upon the

testimony of the VE, the ALJ concluded that plaintiff could work as a housekeeper/cleaner,

an assembler, or an appointment clerk.

      Plaintiff contends that the Commissioner failed to carry his burden of establishing that

she could perform "other work" that existed in the national economy, because she lacks the

residual functional capacity required to perform the jobs identified by the ALJ as described in

the Dictionary of Occupational Titles (DOT).  I agree that there are problems as to the

appointment clerk position and possibly as to the assembler position:  Plaintiff correctly notes

that the DOT identifies the appointment clerk position as semi-skilled, and that the ability to

perform semi-skilled work depends upon the acquisition of skills from past job experience or

from recently completed education.  SSR-83-10.  She also correctly notes that her part-time

work as an appointment setter in the past did not constitute the kind of "substantial gainful

activity" which could have provided her with transferable skills, and that the ALJ found that

she had such skills.  Plaintiff correctly notes that the ALJ's identification of a broad category

FINDINGS AND RECOMMENDATION - 21

of "assembler" jobs is inconsistent with SSR 82-61, which states that relying on broad job

classifications likely results in error because specific subcategories of such work "often

involve quite different functional demands and duties requiring varying abilities . . . ." She

also correctly notes that two of the most common light unskilled assembly jobs described in

the DOT, small products assembler I and II, impose fingering requirements that are

inconsistent with the limitation to "occasional fine manipulation with the left hand" set out

in the ALJ's RFC.

      Plaintiff also contends that she cannot perform the requirements of the

cleaner/housekeeper position because the ALJ found she was "limited to standing and

walking for no more than two hours in an eight-hour day," and that an individual doing that

work "would likely have to be on their feet moving from task to task and room to room for

far greater than two hours in an eight-hour day, and the nature of the tasks involved would

not lend itself to 'at will' position changes" which the ALJ had included in the RFC

assessment. Plaintiff contends that the cleaner/housekeeper position "as described in the

DOT at # 323.687-014, conflicts with Plaintiff's RFC as found by the ALJ."

      I disagree. The VE testified that her responses were consistent with the DOT, and

I find nothing in the cleaner/housekeeper position as described in the DOT which is

inconsistent with ALJ's RFC. See DICOT 323.687-014, 1991 WL 672783. The strength and

standing and walking requirements are consistent with the ALJ's RFC, and the job duties

described appear to allow for frequent postural changes. Plaintiff has not challenged the VE's

assertion that 12,000 cleaner/housekeeping jobs exist regionally and that 764,000 of these

jobs exist nationally. Under these circumstances, the ALJ established that plaintiff could

FINDINGS AND RECOMMENDATION - 22

work as a cleaner/housekeeper, and met the burden of establishing that plaintiff could

perform "other work" that existed in substantial numbers in the national economy.


## Conclusion

A judgment should be entered affirming the Commissioner's decision and dismissing

this action with prejudice.


## Scheduling Order

This Findings and Recommendation will be referred to a district judge.  Objections,

if any, are due March 21, 2011.  If no objections are filed, then the Findings and

Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with

a copy of the objections.  When the response is due or filed, whichever date is earlier, the

Findings and Recommendation will go under advisement.

DATED this 2nd day March, 2011.


 /s/ John Jelderks
John Jelderks
U.S. Magistrate Judge